In re The PATERNITY OF X.A.S., H.S., Appellant–Petitioner,

v.

S.K., Appellee–Respondent.

No. 49A02–0910–JV–1023.

Court of Appeals of Indiana.

June 4, 2010.

Anita Wylie, Indianapolis, IN, Attorney for Appellant.

Kimberly J. Bacon, Indianapolis, IN, Attorney for Appellee.

**OPINION**

BAKER, Chief Judge.

Father and Mother both love their son and have been responsible, dedicated, involved parents. Father met someone who is in the Navy, got married, and has decided to move with his new wife to California, where her ship will be docked. Father, who has been the custodial parent of and primary caregiver for his son with Mother for the past nine years, asked the trial court to permit the child to relocate with Father to California. The trial court denied the request and granted Mother's request to modify custody so that the child could remain in Indiana. We acknowledge that this situation will undeniably cause heartbreak for one of these parents, who will have to drastically curtail the amount of time spent with their son. Inasmuch as someone must prevail, however, we find that while it is a close call, the record simply does not contain sufficient evidence to support a change from the status quo. Thus, we find that the boy should remain with his father.

Appellant-petitioner H.S. (Father) appeals the trial court's order denying his request to relocate to California with X.A.S., Father's child with S.K. (Mother), and granting Mother's petition to modify the parties' custody arrangement. Finding that a number of findings are not supported by the evidence, that a number of inferences drawn from the facts are unreasonable, and that the judgment is not supported by the remaining findings, we reverse and remand with instructions.

*FACTS*

X.A.S. was born on September 14, 1997. On October 12, 1999, Father filed a petition to establish paternity of X.A.S., and on January 11, 2000, the trial court granted the petition and also granted Father custody of X.A.S. subject to visitation with Mother pursuant to the Parenting Time Guidelines (the Guidelines). For the next nine years, X.A.S. lived with Father at the same address in Marion County and visited with Mother according to the Guidelines. The relationship between Mother and Father was cordial during those years. Both Mother and Father were steadily employed until Father was recently laid off from his electrician's job as a result of the economic downturn.

Both parents have been involved in X.A.S.'s life—Mother was a room mother in his classrooms, attended parent/teacher conferences, knew his teachers, and attended his athletic games. Father helped X.A.S. with his homework at night and also attended X.A.S.'s athletic games. X.A.S. has extended family in Indianapolis on both sides of his family and has at least one good friend.

On August 9, 2008, Father married J.S. (Stepmother), who is a member of the United States Navy. The ship to which Stepmother is assigned was under construction for a period of time until the fall of 2009, when the Navy launched the ship and sailed it to its home port of San Diego.

Shortly before Father and Stepmother were married, Father filed a notice of intent to relocate, requesting that X.A.S. be permitted to relocate to California with Father and Stepmother. Mother objected and filed a petition to modify custody. On December 10, 2008, Father requested a Domestic Relations Counseling Bureau (DRCB) investigation, which the trial court granted. The DRCB filed its report with the trial court on May 1, 2009, recommending that X.A.S. be permitted to relocate to California with Father.

The trial court held a hearing on the parties' motions on August 12, 2009. The trial court denied Father's request to conduct an in camera interview of X.A.S.:

> [X.A.S.] is such a young age, what [X.A.S.] is going to tell me is he wants his parents to both live in the same city. I can guarantee that. He's going to say, given the choice, he'd rather live with his dad. I get that.
>
> \* \* \*
>
> I'm not particularly interested in his wishes, even. He may tell me he wants to move to California with his dad. He may think that's what he wants; it's not what's best for him. What's best for him is to have two parents in the same city.

Tr. p. 129–30. Following the hearing, the trial court denied Father's petition to permit X.A.S. to relocate with him to California and granted Mother's petition to modify custody:

> I haven't heard yet today how it's best for [X.A.S.] to move. I've heard all about how it's great for dad. I have a hard time understanding folks who choose romantic partners over their children, but it's your choice to make, sir. If you remain here, [X.A.S.] remains here with you. If you leave, custody transfers to mom.
>
> ... I understood dad's testimony today as dad is moving regardless. I find that kind of disturbing. I don't understand folks who can move clear across the country from their kids. But I've never done it, never been faced with that choice, so it's hard for me to judge dad's rationale, but that's in no way good for [X.A.S.].

*Id.* at 128–29. The trial court entered a summary written order to that effect on August 31, 2009.

On August 24, 2009, Father filed a motion to correct error and to reconsider. On September 25, 2009, the trial court entered an order that entered specific findings to support its original decision. Father now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

The trial court made specific findings of fact and conclusions thereon in denying Father's motion and granting Mother's motion. Accordingly, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind.2009). In reviewing the order being appealed, we will neither reweigh the evidence nor assess witness credibility, instead considering only the evidence that supports the trial court's judgment together with all reasonable inferences to be drawn therefrom. *In re M.B. and P.B.*, 666 N.E.2d 73, 76 (Ind.Ct.App.1996).

We will set aside the judgment only if the findings or judgment are clearly erroneous. *Carmichael v. Siegel*, 754 N.E.2d 619, 625 (Ind.Ct.App.2001). A finding is clearly erroneous when there are no facts or inferences to be drawn therefrom that support it. *M.B.*, 666 N.E.2d at 76. A judgment is clearly erroneous when it is unsupported by the findings and conclusions entered thereon. *In re Adoption of H.N.P.G.*, 878 N.E.2d 900, 904 (Ind.Ct. App.2008), *trans. denied, cert. denied.*

### II. Relocation and Modification Statutes

Indiana Code section 31–17–2.2–1 (the Relocation Statute) governs a parent's desire to relocate. Upon motion of either parent, the trial court must hold a hearing to review and modify custody "if appropriate." I.C. § 31–17–2.2–1(b). The Reloca-

tion Statute provides that when determining whether to modify a custody order or parenting time order in the context of a parent's relocation, the trial court shall take the following factors into account:

(1) The distance involved in the proposed change of residence.

(2) The hardship and expense involved for the nonrelocating individual to exercise parenting time....

(3) The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time ..., including consideration of the financial circumstances of the parties.

(4) Whether there is an established pattern of conduct by the relocating individual[1], including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.

(5) The reasons provided by the:

(A) relocating individual for seeking relocation; and

(B) nonrelocating parent for opposing the relocation of the child.

(6) Other factors affecting the best interest of the child.

*Id.*

Our Supreme Court has explained that in addition to those factors contained in the Relocation Statute, the trial court must also consider other factors identified in Indiana Code section 31–17–2–8 (Section 8) as relevant to every change of custody. *Baxendale v. Raich*, 878 N.E.2d 1252, 1256 (Ind.2008). Section 8 requires that the trial court enter a custody order in accordance with the best interests of the child, considering all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents....

\*     \*     \*

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved....

Indiana Code section 31–17–2–21 (the Modification Statute) provides that a trial court may not modify a child custody order unless modification is in the child's best interests and there is a substantial change in one or more of the Section 8 factors.

Our Supreme Court has explained, however, that the Relocation Statute does not necessarily require a substantial change in one of the original Section 8 factors for custody modification to be warranted. *Baxendale*, 878 N.E.2d at 1257. Therefore, we will focus on the factors set forth in the Relocation Statute, keeping in mind that our Supreme Court has cautioned that the Relocation Statute incorporates all of the Section 8 factors as well. *Id.*

### III.   Father's Relocation Request

Father argues that the trial court erred by denying his request to relocate with X.A.S. and granting Mother's petition to modify the parties' custody arrangement. Specifically, he argues that many of the

---

**1.** "Relocating individual" means an individual who has or is seeking custody of or parenting time with a child and intends to move the individual's principal residence. Ind.Code § 31–9–2–107.5.

trial court's findings do not have evidentiary support in the record and that the ultimate judgment is clearly erroneous. Turning to the trial court's order, we will analyze it in the context of the factors set forth in the Relocation Statute and Section 8.

*The distance involved in the proposed change of residence.* Father seeks to move with X.A.S. from Indianapolis to San Diego, which he acknowledges is an extreme distance.

*The hardship and expense involved for Mother to exercise parenting time.* The trial court found that the hardship and expense for Mother would be "extreme" because she would have to travel on an airplane and pay for lodging in California should she choose to visit X.A.S. Appellant's App. p. 21–22.

Father testified that he was willing to pay for X.A.S. to fly to and from Indianapolis to visit with Mother during the summer, Christmas, and spring breaks. This arrangement is in accordance with the Guidelines, which provide that when there is a significant geographical distance between the parents and the child is over five years of age, the noncustodial parent may have visitation for "seven (7) weeks of the school summer vacation period and seven (7) days of the school winter vacation plus the entire spring break, including both weekends if applicable." Ind. Parenting Time Guideline III cmt. C.

Thus, for Mother to exercise her parenting time, in fact, she would not have to spend any money whatsoever. Father would pay to fly X.A.S. to Indianapolis for Mother's periods of visitation. Should she choose to fly to California to see X.A.S., then she would have to pay for the flight and lodging, but that would be outside the bounds of her parenting time. Therefore, there are no facts or inferences supporting the trial court's finding that Mother would

sustain extreme hardship in exercising her parenting time if X.A.S. relocated to California with Father.

*The feasibility of preserving the relationship between Mother and X.A.S., including consideration of the financial circumstances of the parties.* The trial court found that preserving the relationship between Mother and X.A.S. would prove "nearly impossible" because the parties would "not be able to purchase numerous round trip airfare to allow frequent visits." Appellant's App. p. 22.

As noted above, however, Father testified that he would pay for X.A.S. to fly to Indianapolis during Mother's visitation periods. Mother would spend the summers and Christmas and spring breaks with X.A.S. Although this arrangement is not ideal, it complies with the Guidelines. When parents become separated by distance, it is always difficult, but the parties must cope with reality as best as they can, and it is the job of the courts to help them in that process. Here, Mother and X.A.S. will spend significant portions of every year together—indeed, they will be able to spend considerable time with each other approximately every three months—and will be able to speak on the phone, communicate via email, and send letters to each other. Although this will be difficult, it will not be "nearly impossible." We do not intend to minimize the undeniable pain that this will cause Mother, who is accustomed to seeing X.A.S. far more frequently. But this fractured family will hopefully do its best to make the best of a difficult situation, and we are confident that the relationship between Mother and son will survive.

We must also turn our attention to the finding that "Father's insistence on moving with or without his son effectively robs [X.A.S.] of one of his parents." *Id.* This

finding casts aspersion on Father, his motives, and his actions in a way that is wholly unsupported by the record. Father remarried. His wife has a job in California. Therefore, Father is moving to California to be with his wife, and this difficult decision will not change even if he loses custody of X.A.S. To imply that Father's decision in this regard is selfish, causing unwarranted harm to X.A.S., is not supported by the evidence in the record.

*Whether there is an established pattern of conduct by Father to thwart Mother's contact with X.A.S.* There is no evidence in the record suggesting such a pattern, and the trial court found that no such pattern exists.

*The reasons provided by Father for seeking relocation and Mother for opposing relocation.* Father seeks to relocate so that he can join his wife in California and because X.A.S. had lived with him for the past nine years. Mother opposes relocation because she believes that her relationship with X.A.S. would be "devastated," he would have no extended family or friends in his new community, and he would be better off remaining in a familiar community if he was going to lose regular contact with one of his parents. *Id.* at 23.

*Other factors affecting the best interest of the child.* The trial court made a number of findings under this heading, each of which we will address in turn.

1. "Father advanc[ed] his romantic interests ahead of the child's interests...." Appellant's App. p. 23. We cannot conclude that this finding is supported by evidence in the record. Father got married, and to characterize this relationship as "his romantic interests" is to minimize it to an untenable degree. And to suggest that by getting married Father was somehow failing as a parent creates a standard that is too high for any of us to meet. Parents must occasionally make sacrifices

for the sake of their children, but they need not sacrifice everything. Father was not required to choose between marriage and parenting—he can have both.

2. Father failed to "fully investigate[ ] the school which [X.A.S.] would attend in his new community (he has no idea when the first school break would be and clearly did not understand the school's prep program)...." *Id.* It is true that Father did not know the date of the first school break—because the school had not yet announced it. It is also true that Father did not know all of the details regarding the school's prep program.

The record also reveals, however, that Father testified that X.A.S. would attend a middle school that is within walking distance of their home. Father has talked to people "who can testify to the quality of the school and the teachers, and those kids are doing well." Tr. p. 21. Furthermore, Father called the school and learned that because they are a military family, X.A.S. can enroll on the day they arrive. Therefore, we find that the finding that Father failed to investigate the school is without support in the record.

3. Father decided to relocate "whether [X.A.S.] was permitted to relocate or not...." Appellant's App. p. 23. As noted above, this finding is factually correct. To the extent that the trial court inferred from this fact that Father was being a "bad" or selfish parent, however, we find that the inference was unreasonable.

4. Father was not involved "in [X.A.S.'s] schooling while here in Indiana (he had never attended a parent/teacher conference and could not name any of [X.A.S.'s] teachers)...." *Id.* It is true that Father did not attend any of X.A.S.'s parent/teacher conferences and could only recall the name of X.A.S.'s most recent teacher. It is not true, however, that Fa-

ther was not involved in X.A.S.'s schooling. To the contrary, Father spent nearly every weeknight with X.A.S., helping with homework and making sure all assignments were completed. X.A.S. is a successful student and has gotten As and Bs. If Father—the custodial parent—had been completely uninvolved, it is unlikely that X.A.S. would have had such a successful academic experience. Therefore, we find that there is no support in the record for the trial court's conclusion that Father was not involved in X.A.S.'s schooling.

5. Mother has been stable "in her home, job and education over the past several years...." *Id.* There is evidence in the record supporting this finding, and Father does not dispute it. We note, however, that Father, likewise, has been stable. He and X.A.S. lived in the same home for nine years. He was gainfully employed as an electrician until he was laid off recently as the result of an economic downturn. Therefore, the parties' relative stability does not tip the balance one way or another.

6. "Stepmother will be at sea for 6 months of each year and Father will have no other family support in Southern California...." *Id.* There is no support in the record for this finding. Stepmother testified that her first deployment will occur in August 2011, and until then, "there'll be a couple underways here and there, a week, a weekend, three or four days here and there, but getting ready for deployment. But usually you're home in the evening or the following week usually isn't as busy after you've gone out a week." Tr. p. 94. She may be gone for six months at a time, but she does not know that for a fact, and she does not know how frequently that will occur. After her first deployment, her schedule is unknown. The only mention in the record to the contrary is the trial court's own unsupported observation:

I'm not a fool. I have plenty of military families on my caseload. I am well aware she is not going to be in San Diego for the next five years just hanging out; when that ship's done, it's headed out. We don't build ships to have them sit in docks. Okay?

*Id.* at 57. Aside from the trial court's own comments, there is no support in the record for the finding that Stepmother will be at sea for six months of each year.

Father concedes that he will have no family support in Southern California. We note, however, that the record reveals that Father, Stepmother, and X.A.S. would live in military housing, where there are many families of similar age with children of the same age as X.A.S. There are also support services for military families. Therefore, to the extent that the trial court inferred from the lack of family in California that X.A.S. would be lonely or that Father would have no support system after relocating, we find the inference to be unreasonable.

7. "[X.A.S.] has been actively involved in his community in Central Indiana through his participation in sports activities...." Appellant's App. p. 23. There is support in the record for this finding.

8. "Mother is current in her child support obligation and does not appear to be seeking a modification of custody to gain a financial advantage with regard to child support." *Id.* There is support in the record for this finding.

9. "Finally, the Court, like all patriotic Americans, is grateful to Stepmom for her military service, but Father was aware of her commitments before becoming romantically involved with her and marrying her." *Id.* We again observe that we disagree with the implication that Father was required to choose between marriage and his responsibilities as a parent.

Also included in the Relocation Statute's "other factors" are the criteria set forth in Section 8. Most of them have already been inherently taken into consideration above, but one that has not yet been addressed is the wishes of the child. Father requested that the trial court conduct an in camera interview of X.A.S. to discern the child's wishes. At the time of the hearing, X.A.S. was twelve years old—easily old enough to have well formed, educated opinions about what he wished to do. Rather than conduct the in camera interview, however, the trial court explained that it already knew precisely what he would say and that, in any event, the trial court was not "particularly interested" in X.A.S.'s wishes. Tr. p. 128–29. There is no absolute requirement that the trial court conduct an in camera interview, so we cannot find error in this regard. We believe that the better practice would have been to conduct the interview, however. The DRCB Report indicates that X.A.S. "would like to live with his father in California. He stated his mother is busy a lot and his father spends more time with him. He stated he is actually excited about moving to California, and would like to spend summers with his mother." Ex. 1 p. 9.

Falling under the general factor of the best interests of the child is one of the most important facts contained in the record—X.A.S. has lived with Father for the past nine years. Although moving to another state and away from Mother will undoubtedly cause upheaval in X.A.S.'s life, it would cause far greater upheaval to tear him away from his primary caregiver—the parent with whom he has lived for nearly a decade. The DRCB Report concludes that although X.A.S. has healthy relationships with both parents, it would be best for him to relocate with Father:

> ... [X.A.S.'s] ultimate sense of home and security is with his father. The fact that [Father] has been his primary care-giver is significant. To be clear, to have one parent three thousand miles away from a child is always less than ideal. However, considering [X.A.S.'s] relationship with his father, and the fact that [Father] has concrete plans involving employment, housing, and education, it is recommended that [Father] retain custody and be allowed to relocate to California.

*Id.*

Upon removing the findings of fact that are without support in the record and the unreasonable inferences that were drawn from the facts, the findings that remain are as follows: California is a very long distance from Indiana. Father did not attend parent/teacher conferences and could only remember the name of X.A.S.'s most recent teacher. Mother lives a stable life. X.A.S. was actively involved in sports activities in Indiana. Mother is not seeking modification to gain a financial advantage.

When those findings of fact are considered along with the facts that Father has been X.A.S.'s primary caregiver and custodial parent for nine years, has provided X.A.S. with a stable and healthy life, and has been involved with X.A.S.'s academic and athletic activities, we believe that the trial court's judgment denying Father's request to relocate with X.A.S. and granting Mother's petition to modify custody was clearly erroneous.

X.A.S. is lucky to have two such loving, dedicated parents who clearly only want the best for their son and do not want to be far away from him. One of those parents is facing an undeniable heartbreak. Whatever the outcome herein, X.A.S. will live across the country from one of his parents, though we believe that the parent-child relationship need not be irrevocably damaged in the process. We acknowl-

edge that this is a close case, but because X.A.S. has spent nine of his twelve years living with his Father, we believe that it is in his best interests to continue to do so.

The judgment of the trial court is reversed and remanded with instructions to enter an order granting Father's petition to relocate with X.A.S., denying Mother's request to modify custody, and setting forth new terms of visitation and support, if needed.

DARDEN, J., and CRONE, J., concur.

J.M., Appellant–Petitioner,